**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| JAMES BULDAS<br>3768 Corey Road<br>Toledo, OH 43615<br>individually and on behalf of other<br>persons similarly situated<br><br>       Plaintiff,<br><br>   v.<br><br>FIRSTENERGY CORP.,<br>FIRSTENERGY SERVICE<br>COMPANY, CHARLES E. JONES,<br>JAMES F. PEARSON, STEVEN E.<br>STRAH, K. JON TAYLOR, AND<br>DOES 1-10,<br>76 S. Main Street<br>Akron, OH 44308<br><br>      Defendants. | Case No. _____<br><br>CLASS ACTION COMPLAINT FOR<br>VIOLATIONS OF THE FEDERAL<br>RACKETEER INFLUENCED AND<br>CORRUPT ORGANIZATIONS ACT,<br>THE OHIO CORRUPT ACTIVITY<br>ACT, AND CIVIL CONSPIRACY<br><br>JURY TRIAL DEMANDED<br><br>Richard M. Kerger (0015864)<br>THE KERGER LAW FIRM, LLC<br>4159 N. Holland-Sylvania Rd., Suite 101<br>Toledo, OH 43623<br>Telephone: (419) 255-5990<br>rkerger@kergerlaw.com<br><br>Marvin A. Miller* (1916769)<br>Andrew Szot* (6274264)<br>MILLER LAW, LLC<br>115 South LaSalle Street, Suite 2910<br>Chicago, IL 60603<br>Telephone: (312) 332-3400<br>mmiller@millerlawllc.com<br>aszot@millerlawllc.com<br><br>Kevin P. Roddy* (175362)<br>WILENTZ, GOLDMAN & SPITZER, P.A.<br>90 Woodbridge Center Drive, Suite 900<br>Woodbridge, NJ 07095<br>Telephone: (732) 636-8000<br>kroddy@wilentz.com<br><br>Attorneys for Plaintiff and the<br>Members of the Class (*attorneys to<br>be admitted *pro hac vice*) |

**INTRODUCTION AND SUMMARY OF ALLEGATIONS**

1

Plaintiff, James Buldas, individually and on behalf of a proposed Class of all other persons similarly situated, hereby files his Class Action Complaint (hereinafter the "Complaint") against Defendants, FirstEnergy Corp. ("FirstEnergy"), a public utility holding company; FirstEnergy Service Company ("FirstEnergy Service"), a subsidiary of FirstEnergy which provides legal, financial, and other corporate support services to FirstEnergy; and Charles E. Jones, James F. Pearson, Steven E. Strah, and K. Jon Taylor (collectively the "Individual Defendants"), who are the hands-on managers of and oversee FirstEnergy's operations, business practices, and finances. As alleged in this Complaint, during the Class Period, FirstEnergy, FirstEnergy Services, and the Individual Defendants knowingly and intentionally acted in concert and conspired with Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and Generation Now (collectively the members of the "Householder Enterprise"), and other persons and entities known and unknown, being persons employed by and associated with an "enterprise," which engaged in, and the activities of which affected interstate commerce, and did knowingly and intentionally act in concert and conspire with each other and others known and unknown to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d), and the equivalent provisions of the Ohio Corrupt Activity Act, Ohio Rev. Code § 2923.31 *et seq.,* that is, to conduct and participate directly and indirectly, in the conduct of the affairs of the enterprise through a "pattern of racketeering activity," as that term is defined in 18 U.S.C. §§ 1961(1) and (5), and a "pattern of corrupt activity," as that term is defined in Ohio Rev. Code §§ 2923.31(E) and (I), consisting of multiple wrongful acts under 18 U.S.C. §§ 1343 and 1346 (relating to honest services wire fraud); 18 U.S.C. § 1951

(relating to interference with commerce, robbery, or extortion); 18 U.S.C. § 1952 (relating to racketeering, including multiple acts of bribery under Ohio Rev. Code § 3517.22(a)(2)); 18 U.S.C. § 1956 (relating to the laundering of monetary instruments); 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and multiple acts involving bribery, that are chargeable under Ohio Rev. Code § 2921.02.  It was part of the conspiracy that Defendants, FirstEnergy and FirstEnergy Service, and the Individual Defendants agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, all in violation of 18 U.S.C. § 1962(c) and (d) and Ohio Rev. Code § 2923.32(A)(1).  In support of his/her/their claims for relief, as alleged in this Complaint, Plaintiff further states as follows:

## THE PARTIES

1.      Plaintiff, James Buldas, is a legal resident of the State of Ohio and resides in Lucas County, who has been injured by the Defendants by his payment of monthly surcharges, as set forth in Ohio House of Representatives Bill 6 ("HB 6"), which provided massive customer/ratepayer subsidies for FirstEnergy's Davis-Besse and Perry Nuclear Power Plants.  Plaintiff owns the home with his wife in whose name service is placed.  Plaintiff pays the electric bill and, therefore, is the party who has been injured.

2.      Defendant FirstEnergy is a public utility holding company which directs and controls various subsidiary entities organized under the laws of the State of Ohio with its principal place of business located in Akron, Ohio.  FirstEnergy is involved in the generation, transmission, and distribution of electricity.   This Defendant's agent for

service of process is CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219.

3.     Defendant FirstEnergy Service, is organized under the laws of the State of Ohio with its principal place of business located in Akron, Ohio.  FirstEnergy Service provides legal, financial, and other corporate support services to affiliated companies, including First Energy.  It is under the control of FirstEnergy's management.  It does not have its own Chief Executive Officer or Board of Directors.  This Defendant's agent for service of process is CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219.

4.     At all relevant times, the Individual Defendants ran FirstEnergy as hands-on managers, overseeing FirstEnergy's operations, business practices, and finances. During the Class Period, Defendant Charles E. Jones served as Chief Executive Officer ("CEO") and as a Director of FirstEnergy.  Defendant James F. Pearson served as Chief Financial Officer ("CFO") of First Energy until March 2018, at which time he transitioned to Vice President of Finance until his retirement in April 2019.  Defendant Steven E. Strah is President of FirstEnergy.  He previously served as CFO from March 2018 until he transitioned to his current position in May 2020.  Defendant K. Jon Taylor took over as CFO from Defendant Strah.  Prior to assuming this position, he was the company's Controller and Chief Accounting Officer until March 2018, after which he became President of FirstEnergy's Ohio Operations and, in 2019, its Vide President of Utilities Operations.  At all times relevant to this case, the Individual Defendants had intimate knowledge about the core aspects of FirstEnergy's financial and business operations,

4

including the company's nuclear operations and the wrongful activities alleged in the related criminal proceedings that are pending in this District.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331, and 18 U.S.C. §§ 1961-68.  Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.  Venue is proper in this Court because this is a District in which a substantial part of the events giving rise to the claim occurred.  28 U.S.C. § 1391(b)(2).  Venue is further proper because this is a District in which the Defendants' agent, CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio  43219, is found or transacts affairs, as provided in 18 U.S.C. §1965(a).

## GENERAL STATEMENT OF THE LAW

6.       Section 1962(c) and (d) of RICO provide as follows:

> (c)      It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . .

> (d)      It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . . (c) of this section.

The equivalent provisions of the Ohio Corrupt Activity Act may be found in Ohio Rev. Code §2923.32(A)(1).  Section 1961 of RICO, in turn, defines the terms "enterprise" and "pattern of racketeering activity," as used in Section 1962, as follows:

> (4)      "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

> (5)      "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years

(excluding any term of imprisonment) after the commission of a prior act of racketeering activity.

The equivalent provisions of the Ohio Corrupt Activity Act may be found in Ohio Rev. Code § 2923.31(C) and (E). Section 1961(1) of RICO defines "racketeering activity", in relevant part, as follows:

> (A) [A]ny act or threat involving . . . bribery[,] . . . which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under . . . title 18, United States Code: . . . section 1343 (relating to wire fraud) . . . section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering) . . . section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity) . . . .

The equivalent provisions of the Ohio Corrupt Activity Act may be found in Ohio Rev. Code § 2923.31(I).

7.     On or about July 21, 2020, a Complaint was filed by the United States of America against the members of the "Householder Enterprise" – namely, Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and Generation Now I in this District, Case No. 1:20-MJ-00526 (the "Criminal Complaint"), alleging that they violated 18 U.S.C. §1962(d) by conspiring to participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity. The Criminal Complaint was supported by an 81-page Affidavit in Support of a Criminal Complaint (the "Affidavit") executed by an agent of the Federal Bureau of Investigation. Based upon information and belief, Plaintiff alleges that Defendant, FirstEnergy, is "Company A Corp." identified in the Affidavit and that Defendant FirstEnergy Service is "Company A Service Co." identified in the Affidavit. On July 30,

6

2020, the members of the Householder Enterprise who were identified in the Criminal Complaint and the Affidavit were charged in a federal Indictment for violations of RICO. (Note: The members of the Householder Enterprise are not named as Defendants in this Complaint; however, consistent with the provisions of Rule 15 of the Federal Rules of Civil Procedure, Plaintiff reserves the right, after appropriate and sufficient fact discovery has been conducted, to seek leave of Court to name additional Defendants in this case.)

## **FACTUAL ALLEGATIONS**

8.     Plaintiff incorporates by reference the factual allegations set forth in the Affidavit.

9.     From March 2017 to March 2020, the Householder Enterprise, as described and defined in the Affidavit and in this Complaint, received approximately $60 million from FirstEnergy and/or FirstEnergy Service paid through Generation Now and controlled by Householder and the members of the Householder Enterprise.   In exchange for these illicit and unlawful payments, the Householder Enterprise helped pass HB 6, described by a Householder Enterprise member as a billion-dollar "bailout" that saved from closure two failing nuclear power plants in Ohio affiliated with FirstEnergy.   The members of the Householder Enterprise then worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative.   To achieve these ends, and to conceal the scheme, the Householder Enterprise passed money received from FirstEnergy and/or FirstEnergy Service through multiple entities that it controlled.   The Householder Enterprise then used these bribe payments to further the goals of the Enterprise, which include (a) obtaining, preserving, and expanding Householder's

political power in the State of Ohio through the receipt and use of secret payments; (b) enriching and benefitting the Householder Enterprise, its members, and associates; and (c) promoting, concealing, and protecting purposes (a) and (b) from public exposure and possible criminal prosecution.

### BACKGROUND FACTS

10.     In 2016, FirstEnergy's nuclear generation future looked grim.   In its November 2016 Annual Report to Shareholders, FirstEnergy and its affiliates reported a weak energy market, poor forecast demands, and hundreds of millions of dollars in losses, particularly from its nuclear energy affiliate.   Given this backdrop, FirstEnergy announced future options for its energy generation portfolio as follows:  "legislative and regulatory solutions for generation assets"; asset sales and plant deactivations; restructuring debt; and/or seeking protection under U.S. bankruptcy laws for its affiliates involved in nuclear generation.

11.     Consistent with this forecast, FirstEnergy actively sought a "legislative solution" for its two affiliated nuclear power plants in Ohio.   For example, during FirstEnergy's fourth-quarter 2016 earnings conference call, its President and CEO stated:

> *In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security.  Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon.  The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation.  We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.*
>
> *We are advocating for Ohio's support for its two nuclear plants,*

> *even though the likely outcome is that FirstEnergy won't be the long-term owner of these assets.  We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.*

12.     However, attempts to obtain a legislative solution had failed to pass, including the ZEN (Zero-Emissions Nuclear Resource Program) energy proposals outlined in House Bill 178, Senate Bill 128, and House Bill 381 in 2017.

13.     While FirstEnergy was in search of a solution to its nuclear energy problem, Householder was re-entering politics, winning back his State House seat in Perry County, Ohio, with the goal of winning back the Speakership of the House in January 2019.  Following his January 2017 trip on FirstEnergy's private jet, in March 2017, Householder began receiving quarterly $250,000 payments from FirstEnergy and/or FirstEnergy Service into a bank account in the name of a Section 501(c)(4) entity secretly controlled by Householder called Generation Now.  During 2017 and 2018, the Householder Enterprise received into Generation Now, and the entities it controlled, over $2.9 million from FirstEnergy and/or FirstEnergy Service.  Members of the Householder Enterprise used these payments for their own personal benefit and to gain support for Householder's political bid to become Speaker of the House.  During the Spring and Fall of 2018, the Householder Enterprise spent millions of dollars of FirstEnergy's money to support House candidates involved in primary and general elections whom the Householder Enterprise believed both would vote for Householder as Speaker and, ultimately, would follow his lead as Speaker and vote for bailout legislation for FirstEnergy.

14.     Householder-backed candidates that benefitted from FirstEnergy's money received by Generation Now (described throughout this Complaint and the Affidavit as

"FirstEnergy-to-Generation Now" payments) helped elect Householder as the Speaker of the House in January 2019.  Householder fulfilled his end of the corrupt bargain shortly thereafter.  Just three months into his term as Speaker, HB 6 was introduced to save from closure FirstEnergy's two failing nuclear power plants.  Specifically, HB 6 subsidized nuclear energy operations in Ohio through a monthly charge on all Ohio residents' energy bills.   Neil Clark described the legislation as a "bailout" for FirstEnergy's nuclear assets, worth at least $1.3 *billion* to FirstEnergy.

15.    After the introduction of the bailout legislation, FirstEneergy, which was under the management and control of the Individual Defendants, began increasing its payments into Generation Now for the benefit of the Householder Enterprise.  On April 30, 2019, roughly two weeks after introduction of the legislation, the Individual Defendants caused FirstEnergy to wire transfer $1.5 million to Generation Now.  During the month of May 2019, while the controversial legislation was pending before Ohio lawmakers, the Individual Defendants caused FirstEnergy to wire transfer four additional payments totaling $8 million.  The Householder Enterprise used some of that money for mailers and media advertisements to pressure members to support the legislation; the Householder Enterprise members also used FirstEnergy's money for their personal benefit, as described in this Complaint and in the Affidavit.  In the same month that the Householder Enterprise received $8 million from Defendants, Householder and other Householder Enterprise members pressured House members to vote for HB 6, and instructed at least one representative to destroy text messages sent by Householder after Householder's attempt to gain support for HB 6 from that representative.

16.    On May 29, 2019, HB 6 passed the House, and after Householder Enterprise members exerted pressure on the Senate, the legislation was passed and was signed into law by Governor DeWine.  That process took just two months; however, the law would not go into effect until October 22, 2019.  Shortly after the Governor signed the legislation, a campaign began, to organize a statewide ballot-initiative referendum (the "Ballot Campaign") to overturn the legislation.  This effort required Ballot Campaign organizers to collect the signatures of registered voters in order to put the referendum of HB 6 on the 2020 ballot.

17.    In response, the Individual Defendants caused accounts controlled by FirstEnergy to wire transfer over $38 million into Generation Now to defeat the ballot initiative so that HB 6 would go into effect.  The members of the Householder Enterprise funneled the money to various accounts and entities that they controlled in order to purchase media advertisements and mailers against the ballot initiative, to conflict out signature-collection firms, and to pay off and bribe signature collectors who were seeking signatures to support the referendum.  The members and associates of the Householder Enterprise also used FirstEnergy's money to enrich themselves and further their own personal interests.

18.    The Individual Defendants caused FirstEnergy and/or FirstEnergy Service to transfer to the Householder Enterprise a total of $60,886,835.86 in secret payments over the approximately three-year period in exchange for the billion-dollar-bailout.  The Individual Defendants and the members of the Householder Enterprise concealed the payments by using a Section 501(c)(4) "charitable" organization to receive the bribe money, and then transferring the payments internally to a web of related entities and

accounts. The millions paid into the entity are akin to bags of cash; unlike campaign contributions or political action committee ("PAC") contributions, they were not regulated, not reported, not subject to public scrutiny, and the members of the Householder Enterprise freely spent the bribe payments to further their political interests and to enrich themselves. As Neil Clark stated in a 2019 recorded conversation that was reproduced in the Affidavit, "*Generation Now is the Speaker's (c)(4),*" and FirstEnergy's "*deep pockets,*" and the money that was wire transferred to the Householder Enterprise through Generation Now was "*unlimited.*" Matthew Borges similarly described FirstEnergy's illicit payments to the Enterprise as "*Monopoly money.*"

19.     The members of the Householder Enterprise used some of FirstEnergy's money to help enact the bailout legislation. Additionally, the Householder Enterprise used millions of dollars of FirstEnergy's bribe money to further Householder's political ambitions by funding his political campaign, and the campaigns of members and candidates who would eventually support Householder's election for Speaker. FirstEnergy's illicit payments funded the operating costs of the Householder Enterprise and paid for Householder's political and campaign staff. Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and/or Generation Now also paid themselves personally millions of dollars in bribe payments, funneled through Generation Now and other entities controlled by the Householder Enterprise. This includes allowing for the payment of at least $500,000 in what appears to be personal benefits to Householder that was passed through Longstreth-controlled bank accounts. In addition, the members of the Householder Enterprise had over $8 million of

FirstEnergy's money in their controlled bank accounts at the end of 2019, which represents further profit to the members of the Householder Enterprise.

## THE HOUSEHOLDER ENTERPRISE

20.     Until he was removed from that position by a unanimous vote on July 30, 2020, Larry Householder was the current Speaker of the Ohio House of Representatives at all times relevant.   He previously served as a House member representing Ohio's 72nd District from 1997 to 2004, including as Speaker of the House from 2001 to 2004.   Householder resigned from office after reports of alleged corrupt activity surfaced in the media and were publically referred to the FBI; however, he was not charged at that time.   Householder won his House seat back in the Fall of 2016.   He was elected Speaker again in January 2019, after what the Ohio media described as a bitter leadership battle that lasted nearly a year.

21.     Householder's path to the Speakership was unusual.   Householder and another representative, both of whom are Republicans, were candidates to be Speaker of the House for the 133rd General Assembly.   After the then-Speaker's resignation in May 2018, a protracted conflict began to select a Speaker for the remainder of the 132nd General Assembly.   Ultimately, the other representatives became Speaker pending the upcoming 2018 election, after the unprecedented conflict that was resolved using a House rule that could only be employed after ten failed attempts to select a Speaker. Despite the other representatives' selection in mid-2018 to serve as House Speaker for the remainder of the 132nd General Assembly, Householder aggressively sought support for his candidacy for Speaker.   He did so in a number of ways, including by providing financial support, paid for in large part by FirstEnergy, to certain candidates

running for House seats in the Spring 2018 primary and the November 2018 general election.  In the end, his strategy was successful as he won the Speakership despite another representative serving in that role prior to the 2018 election.

22.     The Householder Enterprise had several purposes, one of which was to increase Larry Householder's political power through corrupt means.  In his role, Larry Householder solicited and accepted payments from FirstEnergy into his Section 501(c)(4) account; he used the bribe payments to further his political interests, enrich himself and other members and associates of the Householder Enterprise, and to assist in passing and preserving the bailout legislation; and, in return for the benefits received, he coordinated passage of HB 6 and attempted to influence legislators to support the bailout, among other things.

23.     Larry Householder benefitted personally from the activities of the Householder Enterprise.  For example, while funded by FirstEnergy-to-Generation-Now bribe money, at least $300,000 passed through and funded bank accounts controlled by Jeff Longstreth, which the Householder Enterprise used to pay legal fees and settle a lawsuit against Larry Householder.  Over $100,000 of the FirstEnergy-to-Generation-Now bribe money was passed through bank accounts controlled by Jeff Longstreth and used to pay costs associated with Larry Householder's Florida home.  In addition, at least $97,000 of the FirstEnergy-to-Generation-Now bribe money was used to pay expenses for Larry Householder's 2018 political campaign.

24.     Jeff Longstreth is Larry Householder's longtime campaign and political strategist.  Neil Clark identified Jeff Longstreth as Larry Householder's "*political guy,*" his

"*implementer,*" and one of his "*closest advisors,*" who was instrumental to the Householder Enterprise's efforts to pass HB 6.

25.     Although Jeff Longstreth is not employed by the State of Ohio, he has been Larry Householder's chief political strategist.  He ran Larry Householder's political campaign, and he and his staff managed the 2018 campaigns for the Householder Enterprise-backed candidates (at times internally referred to by members of the Householder Enterprise as "Team Householder" candidates).  Larry Householder and Jeff Longstreth shared office space that was rented from their Political Advertising Agency.  In addition, Jeff Longstreth led the messaging efforts both in the campaign to pass HB 6 and to defeat the referendum, and was a point of contact for FirstEnergy and the Individual Defendants.

26.     Jeff Longstreth also played a critical role with respect to the the Householder Enterprise's finances.  He was a signatory on both of the Generation Now bank accounts and the person who transferred money out of the accounts to other entities to further the Householder Enterprise.  Jeff Longstreth also controlled entities that receive FirstEnergy-through-Generation Now payments to further the Householder Enterprise.  Among these entities, Jeff Longstreth owns and operates JPL & Associates.  Throughout the relevant period, Jeff Longstreth transferred over $10.5 million of FirstEnergy's bribe payments directly from Generation Now's primary bank account to JPL & Associates' primary bank account.  In addition, Jeff Longstreth received indirectly another $4.4 million, which was transferred from the Generation Now account through another entity and then into bank accounts that he controlled.  Jeff Longstreth then used FirstEnergy's payments funneled through Generation Now to further Larry

Householder's and FirstEnergy's interests and to pay personal benefits to members and associates of the Householder Enterprise. Jeff Longstreth benefitted personally through the conspiracy's actions, receiving over $5 million in FirstEnergy-to-Generation-Now money during the relevant period, including at least $1 million, which he transferred to his brokerage account in January 2020.

27. Neil Clark owns and operates Grant Street Consultants, an Ohio-based lobbying firm that focuses on legislative, regulatory, and procurement lobbying at the Ohio Statehouse. Prior to becoming a lobbyist, Neil Clark served as a budget director for the Ohio Senate Republic Caucus. During the relevant period, Neil Clark worked as a lobbyist for various political interest groups.

28. Along with Jeff Longstreth, Neil Clark is, in his own words, one of Larry Householder's "*closest advisors.*" According to Neil Clark's admissions, made during recorded conversations in 2019, he served as Larry Householder's "*proxy*" in the Householder Enterprise's efforts to further the enactment of HB 6 an ensure HB 6 went into effect in October 2019 by defeating the subsequent ballot-initiative challenge. Neil Clark also communicated directly with House members to further the Householder Enterprise. In 2019, Neil Clark described himself in recorded communications as Larry Householder's "*hit man*" who will do the "*dirty shit.*" Clark stated that "*when [Householder's] busy, I get complete say. When we're working on stuff, if he says, 'I'm busy,' everyone knows. Neil has the final say, not Jeff. Jeff is his implementer.*" Matthew Borges confirmed Neil Clark's role, and similarly described Neil Clark as Larry Householder's "*proxy*" relating to FirstEnergy matters. Neil Clark benefitted personally

from FirstEnergy's payments to the Householder Enterprise, receiving at least $290,000 in FirstEnergy-to-Generation-Now money.

29.     Matthew Borges is a registered lobbyist for a subsidiary of FirstEnergy. He was a key middleman and was at the center of the effort to thwart the referendum to stop HB 6 from taking effect through a ballot-initiative drive.  On August 5, 2019, shortly after the Ballot Campaign was announced, Matthew Borges incorporated 17 Consulting Group.  Two days later, Matthew Borges opened a bank account for 17 Consulting Group, and that same day Generation Now wired $400,000 into the account.  Over the next few months, Generation Now wired a total of $1.62 million into the account.

30.     Approximately one month after Generation Now began wire transferring money into Matthew Borges' 17 Consulting Group's account, he paid $15,000 in exchange for inside information about the Ballot Campaign, which Matthew Borges would use to help defeat the Ballot Campaign.  Bank account records show that the $15,000 paid came from the 17 Consulting Group account, which was funded by Generation Now wire transfers.  Matthew Borges also paid Juan Cespedes $600,000 of Generation Now money from his account.  With the money wire transferred from Generation Now, Matthew Borges also paid a private investigator during this period, which, as described below, is consistent with the Householder Enterprise's strategy of investigating the signature collectors that worked for the Ballot Campaign.

31.     Matthew Borges had contact with Larry Householder in January 2019 and April 2019 – key time-periods, as described below, involving official action by Larry Householder.    Matthew Borges benefitted directly from the $1.62 million from

Generation Now wire transfers. Specifically, he paid himself over $350,000 from FirstEnergy-to-Generation-Now proceeds.

32. Juan Cespedes served as a key middleman, participating in strategy meetings and communicating with Householder Enterprise members and associates regarding strategic decisions. Juan Cespedes is a multi-client lobbyist, whose services were retained by a subsidiary of FirstEnergy. He was central to this company's efforts to get the bailout legislation passed in Ohio. As explained in this Complaint and in the Affidavit, a contract between this company and Juan Cespedes' lobbying company, the Oxley Group, shows this company hired Juan Cespedes to pursue the bailout legislation starting in the Spring of 2018. Consistent with this, records show that Juan Cespedes was the "lead consultant" relating to attempts to pursue legislation would save FirstEnergy's failing nuclear power plants. In internal documents, Juan Cespedes tracked "Householder camp" candidates who later received FirstEnergy-to-Generation-Now money, and he advised that if Larry Householder became the Speaker, the nuclear energy bailout "will likely be led from his Chamber."

33. Juan Cespedes received approximately $600,000 from the Householder Enterprise and $227,000 from FirstEnergy in 2019. He also was in regular contact with both the Individual Defendants and Householder Enterprise members during the relevant period. As set forth below, Juan Cespedes and Jeff Longstreth communicated regularly through text messages discussing the coordination of millions of dollars in FirstEnergy's payments to the Householder Enterprise, attaining public officials' support for the bailout, sending media and mailers supporting the bailout legislation, and hiring

signature firms to defeat the ballot campaign, among other things. Juan Cespedes coordinated the timely payment of $15 million from FirstEnergy to Generation Now.

34.     Generation Now, Inc. received approximately $60 million from FirstEnergy and/or FirstEnergy Service during the relevant period. As set forth more fully below, Generation Now registered with the Internal Revenue Service ("IRS") as a Section 501(c)(4), which is an IRS designation for a tax-exempt social welfare organization. Pursuant to federal law, the names and addresses of contributors to Section 501(c)(4) organizations are not made available for public inspection. The members of the Householder Enterprise concealed the bribery scheme by funneling the money through Generation Now, which hid the payments and the scheme from public scrutiny. Generation Now's accounts had a combined balance of approximately $1.67 million as of January 1, 2020, money that is a direct benefit to the Householder Enterprise. As described in this Complaint and in the Affidavit, after making wire transfers to Coalition in early 2020, the Generation Now accounts were replenished by a $2 million wire from Energy Pass-Through (a non-profit Section 501(c)(4) organization that was incorporated in Ohio on February 28, 2017, two days after Generation Now was incorporated in Delaware) in March 2020, bringing the combined balance of the accounts to approximately $2.9 million, again, money that is a direct benefit to the Householder Enterprise.

## RELATED ENTITIES CONTROLLED BY THE HOUSEHOLDER ENTERPRISE

35.     The Householder Enterprise used and relied on a number of different entities to further the conspiracy alleged in this Complaint. The following

entities were controlled by, worked directly with, or funneled payments for the benefit of the Householder Enterprise:

a.     JPL & Associates LLC is controlled by Longstreth. Longstreth is the signor on five different bank accounts that have received money directly from Generation Now, including two JPL business accounts, one personal account, and two accounts named "Constant Content." Numerous internal money transfers to Generation Now money were made among Longstreth-controlled accounts. In total, JPL's main business account received over $10.5 million in FirstEnergy-to-Generation-Now wire transfers during the relevant period, which Longstreth then transferred internally to his other accounts. Longstreth also received indirectly $4.4 million, which had been funneled from Generation Now, through another entity (the "Front Company" discussed below) and into Longstreth's Constant Content accounts. Analysis of the accounts by the FBI shows that the money was used to pay benefits directly to Householder Enterprise members and to further the Householder Enterprise's interests by paying campaign staff for preferred Householder Enterprise political candidates, among other things. After the ballot initiative campaign failed and HB 6 became law for the benefit of FirstEnergy, Longstreth consolidated most of the Householder Enterprise funding into JPL-controlled accounts. As of January 1, 2020 that total balances within JPL-controlled accounts exceeded $6.5 Million. This money is a direct benefit to the Householder Enterprise.

b.     "PAC" is a federal PAC through which Generation Now funneled FirstEnergy payments in furtherance of the conspiracy. The Householder Enterprise primarily used the PAC during the May 2018 primary election as a way to conceal the

source of media buys for "Team Householder" candidates. The attorney who is listed as the treasurer for Generation Now and who is a signatory on the Generation Now accounts along with Jeff Longstreth, is the treasurer and a signor of the PAC account.

        c.    Although Longstreth was not a signor on the PAC bank account, documents obtained by the FBI confirm Longstreth's control over the PAC. For example, a Word document titled "Client Information Request Form," last modified by Longstreth in October 2016, listed Longstreth as the "Executive Director or President" of the PAC. In addition, Longstreth's resume, created by Longstreth in November 2016, states that Longstreth oversees political activities for the PAC. Contribution forms for the PAC list Longstreth as the "Contact" and include Longstreth's e-mail address and telephone number. Toll call records corroborate Longstreth's role, showing frequent contact with the attorney when Generation Now needed to move money to and from PAC.

        d.    In early 2018, the PAC bank account was funded almost entirely by a $250,000 wire transfer and a $750,000 wire transfer from Generation Now made on April 2 and April 12, 2018, respectively. By April 30, 2018, nearly all of the one million dollars was paid to two media services firms, which spent the money on media buys and other efforts to benefit Householder political candidates, including Larry Householder himself, in advance of the May 8, 2018, Ohio primary election.

        e.    The account was unused until Generation Now wired an additional $50,000 to the account in September 2018, in advance of the Fall 2018 election. Close to $40,000 of that wire transfer was paid to a political strategy group within weeks of the wire transfer. Aside from payments to the attorney's law firm, the balance remained in

the account.

   f. The account remained largely inactive from October 2018 until January-February 2020, when the Householder Enterprise wired $1,010,000 of money from Defendants to the "Coalition" (described below), which passed through to PAC roughly the same amount of money over the next two months. Expenditures from the PAC in Federal Election Commission filings, along with media purchased by PAC, show that the Householder Enterprise used FirstEnergy's money funneled to the PAC to benefit Team Householder candidates for the 2020 primary election.

   g. "Coalition" is another 501(c)(4) non-profit entity for which the attorney who is treasurer and signor for the PAC is the signor on the Coalition's bank account. The attorney incorporated Coalition in Delaware one day after he incorporated PAC. Longstreth's resume states that he oversees political activities for the Coalition. An FBI investigation indicated that Longstreth possessed a copy of the W-9 taxpayer identification form for the Coalition. He also saved Word documents characterized as "scripts" to use when soliciting money from donors to the Coalition.

   h. For calendar years 2017 through 2019, the Coalition was funded almost exclusively through (1) $90,000 from First Energy, (2) $300,000 from "Energy Pass-Through" (a FirstEnergy pass-through, as set forth below), and (3) $200,000 from an interest group that was funded exclusively by $13 million from another energy company that supported HB 6 and separately paid $150,000 to Generation Now during the relevant period. Outgoing payments from the Coalition account were over $100,000 in two wires to JPL & Associates; $54,000 wired to Generation Now; $191,000 wired to Media Placement Company 1; and $200,000 wired to a public relations firm.

i.     The Coalition account was largely unused from August 2018 until January 2020 when, as described directly above, the Householder Enterprise used the Coalition as a pass-through for FirstEnergy-to-Generation-Now money to PAC, which the Householder Enterprise then used to support Larry Householder-backed candidates in the 2020 primary election.  The benefit of passing the money through the Coalition was that the PAC listed the Coalition as the source of the $1,010,000 million in FEC filings, not Generation Now.  The Householder Enterprise sought to conceal Generation Now as the source of PAC funds in 2020 for numerous reasons, including, as explained in this Complaint and in the Affidavit, Generation Now had generated negative media publicity in 2019 and candidates expressed concern to Larry Householder about their association with it.

j.     Thus, this account is a mechanism for Generation Now to spend secret money for the benefit of Larry Householder and the Householder Enterprise.

k.     "Dark Money Group 1" is an entity used by Householder Enterprise conceal the source of media buys during the 2018 general election, similar to the way the Householder Enterprise used PAC for the primaries in 2018 and 2020.  An Ohio lobbyist incorporated Dark Money Group 1 in Ohio on September 21, 2018, and opened its bank account on September 25, 2018.

l.     The majority of activity in the account occurred roughly one month later, between October 2018 and Election Day on November 6, 2018.  From October 19 to October 29, 2018, Generation Now wired $670,000 into the account; FirstEnergy wired $500,000 into the account; and other corporate interests wired $300,000 into the account, totaling $1,470,000.  From October 22 to November 2, 2018, Media Placement

Company 2 then spent $1,438,510 on media buys for advertisements paid for by Dark Money Group 1 that generally targeted rivals of candidates aligned with Larry Householder. Since Election Day in 2018, the account has been largely unused.

m. "Front Company" is a pass-through entity used by the Householder Enterprise to fund the campaign against the referendum in furtherance of the conspiracy. The for-profit entity was organized in Ohio on July 30, 2019, just days after the Ballot Campaign to overturn HB 6 began.

n. From August 1, 2019 through October 2019, FirstEnergy controlled accounts wired Generation Now $38 million; Generation Now then wired $23 million from those payments to Front Company, the vast majority of which was used to pay signature collection firms to fight against the Ballot Campaign and to pay for media opposing the Ballot Campaign. Generation Now was the sole source of money deposited into the Front Company account. By November 2019, less than $5,000 remained in the Front Company account.

### THE USE OF GENERATION NOW TO RECEIVE BRIBE PAYMENTS FROM FIRST ENERGY

36. On or about February 6, 2017, Generation Now, Inc. was incorporated in Delaware, and two bank accounts were opened at Fifth Third Bank (account numbers 3310 and 6847). Bank records show that an attorney and Jeff Longstreth were signatories on both accounts. On or about July 26, 2017, Generation Now registered with the Ohio Secretary of State as a foreign nonprofit corporation "organized exclusively for the promotion of social welfare and economic development purposes within the meaning of Section 501(c)(4) of the Internal Revenue Code ("the Code"), or

the corresponding section of any future federal tax code." The attorney signed the application as the treasurer of Generation Now.

37.     Although Larry Householder was not listed on registration documents or in account records for Generation Now, the Householder Enterprise used Generation Now to receive secret payments for Larry Householder.

38.     At that time, there was aggressive lobbying for legislative action to save FirstEnergy's two nuclear power plants. Table One in Paragraph 47 of the Affidavit lists each of FirstEnergy's illicit payments received by Generation Now during the period from March 2017 until March 2020, totaling $59,996.835.86.

39.     In addition to the $59,996.835.86 that FirstEnergy paid directly to Generation Now, FirstEnergy made $890,000 in other timely payments to the Householder Enterprise, including payments of $500,000 to Dark Money Group 1 and $90,000 to Coalition, and an Energy Pass-Through payment of $300,000 to Coalition, all of which are detailed in the Affidavit. These payments bring the total amount of direct payments from FirstEnergy to the Householder Enterprise during the relevant period as $60,886,835.86. During the scheme and conspiracy described in this Complaint, other entities besides FirstEnergy deposited money into Generation Now; the amounts of those deposits, however, are dwarfed by FirstEnergy's payments.

40.     Although Larry Householder's name is not on Generation Now's paperwork, an FBI investigation concluded, based on Larry Householder's statements, Neil Clark's statements, and a review of documentation obtained pursuant to search warrants and grand jury subpoenas, that Larry Householder controls Generation Now to further the Householder Enterprise's goals.

41. FirstEnergy and FirstEnergy Service funded Householder's Speakership bid in exchange for a legislative fix for its nuclear power plants.

42. The volume of FirstEnergy's payments, the timing of these payments, communications and coordination amongst co-conspirators and the Individual Defendants, the official action(s) taken by Larry Householder, and the actions to maintain the official action, show the corrupt arrangement of FirstEnergy's funding of Larry Householder's speakership bid in exchange for a legislative fix.

43. As described in this Complaint and in the Affidavit, the vehicle to collect the vast amounts of money needed for Larry Householder's Speakership bid was Generation Now. From the time the Generation Now bank accounts were opened in 2017 through the November 2018 general election, the Householder Enterprise received approximately $4.6 million into Generation Now. More than one-half of that money came from FirstEnergy, FirstEnergy Service, or the Energy Pass-Through, fully funded by FirstEnergy. More than one-half million of the remaining money came from energy-related entities that either had a relationship with FirstEnergy or an interest in the bailout legislation. The remaining amount of money (approximately $1.6 million) came from approximately 31 other interest groups.

44. The Individual Defendants caused FirstEnergy to make regular, quarterly payments of $250,000 into Generation Now's main bank account almost immediately after Jeff Longstreth opened that account in 2017. But, in March 2018, approximately two weeks before FirstEnergy's corporate affiliates filed for bankruptcy, FirstEnergy began funneling payments to Generation Now through Energy Pass-Through. The payments wired from FirstEnergy Service into the Energy-Pass-Through originated from

account number 6496, the same account used to wire transfer payments directly from FirstEnergy Service into Generation Now. In the final month before the 2018 general election, FirstEnergy deposited another $500,000 into the Generation Now account. This time the money was paid by check from account number 4788. The payments from FirstEnergy during 2017-2018 are summarized in Paragraph 82 of the Affidavit. Other payments are described in Paragraph 83 of the Affidavit. The close coordination of activities between FirstEnergy, the Individual Defendants, and Larry Householder is set forth in Paragraphs 84-86 of the Affidavit.

45. On or about July 24, 2018, a few months after the primary elections, $215,000 was wire transferred from Jeff Longstreth-controlled accounts to settle a personal lawsuit against Larry Householder. On August 1, 2018, the same day that Larry Householder was meeting with FirstEnergy executives in Columbus, according to documents in Juan Cespedes' possession, a court filing in Franklin County Court "released and forever discharged" the judgment against Larry Householder and Householder Ltd. The main JPL account was funded with wire transfers from Generation Now, which was funded in large part by FirstEnergy wire transfers. In addition, bank records will show that JPL's main account also paid the fees of Larry Householder's attorneys involved in the lawsuit in May 2017 via two checks totaling $60,000. At the time JPL made those payments, it had received more than $78,000 from Generation Now, which had been funded in part by a $250,000 wire from FirstEnergy and a deposit from Longstreth on the date he opened the account. JPL also paid the same law firm additional fees totaling $25,308.43 in 2018.

## BAILOUT LEGISLATION PASSED FOR FIRST ENERGY

46.     The Householder Enterprise transitioned quickly to fulfilling its end of the corrupt bargain with FirstEnergy by passing nuclear bailout legislation. In fact on January 7, 2019, the day he was elected Speaker of the House, Larry Householder pledged to create a standing subcommittee on energy generation.  Larry Householder then followed through shortly after his election as Speaker by passing the HB 6 legislation and defending the bill against the ballot initiative challenge.

47.     The Householder Enterprise's efforts to pass the legislation and preserve it against the Ballot Campaign challenge were funded entirely by FirstEnergy and/or FirstEnergy Service, through illicit payments to Generation Now. While HB 6 was pending in the House, FirstEnergy wire transferred Generation Now the sum of $9,500,000. When the bill was pending in the Senate, FirstEnergy wire transferred Generation Now the sum of $7,358,255. And, to fund its efforts to defeat the Ballot Campaign, FirstEnergy wire transferred an additional $38,000,000 to Generation Now. The volume and frequency of these payments provide further evidence of the Householder Enterprise's corrupt arrangement with FirstEnergy and the Individual Defendants. These facts, including the Householder Enterprise's passage of HB 6, its efforts to defeat the subsequent Ballot Campaign, and FirstEnergy's involvement and coordination funding these efforts, are set forth in this Complaint and in the Affidavit.

## HOUSE BILL 6

48.     Consistent with their unlawful scheme, the Householder Enterprise implemented a strategy to pass a legislative fix for FirstEnergy and its related entities shortly after Larry Householder was selected Speaker. The strategy involved ramming a sweeping piece of legislation – HB 6 – through the House and pushing the Senate to

agree. First, Larry Householder picked freshman representatives, which he had helped to elect by using FirstEnergy-to-Generation-Now dollars for their benefit in the 2018 election, to sponsor the bill that he helped draft. Second, Larry Householder created a new subcommittee to hear the bill, which was comprised mostly of his political supporters. Third, the Householder Enterprise engaged in an expensive media blitz, funded by FirstEnergy-to-Generation-Now payments, to pressure public officials to support the bill. Fourth, Larry Householder strong-armed House members, particularly the opponents of the bill. Finally, Larry Householder and the Householder Enterprise pressured Senators to pass the legislation. The expediency and funding of this legislative effort and the tactics used by the Householder Enterprise, along with timely communications between Householder Enterprise members and agents of FirstEnergy, including the Individual Defendants, are further evidence of the unholy and illicit agreement between Larry Householder and FirstEnergy.

49.     On April 12, 2019, roughly three months after Larry Householder became Speaker, HB 6 was introduced.   Although the bill was entitled "Ohio Clean Air Program," the FBI investigation shows that HB 6 was conceived to prevent the shutdown of FirstEnergy's nuclear power plants as explained in Paragraphs 111-186 of the Affidavit.

50.     HB 6 was important to the Householder Enterprise because it received millions of dollars into Generations Now from FirstEnergy in exchange for enactment of the bailout legislation. And, thus, the repeal of HB 6, which would prevent HB 6 from taking effect in October 2019, was viewed as a threat to the Householder Enterprise.

51.     FirstEnergy and/or FirstEnergy Service funded and/or participated in the funding of the Householder Enterprise to defeat the Ballot Campaign to repeal HB 6, as alleged in Paragraphs 187-215 of the Affidavit.  The efforts to prevent the repeal of HB 6 included bribing an employee of the Ballot Initiative to gain inside information, and bribes to signature collectors, as detailed in Paragraphs 216-239 of the Affidavit.

52.     The members of the Householder Enterprise worked closely with FirstEnergy and the Individual Defendants to defeat the repeal of HB 6.  During this period, the Individual Defendants caused FirstEnergy to pay the Householder Enterprise over $38 million.  For example, on October 10, 2019, FirstEnergy wire transferred $10 million to Energy Pass-Through, which then wired $10 million to Generation Now, as detailed in Paragraphs 169-170 of the Affidavit.

53.     The efforts to prevent a repeal of HB 6 were successful.  On October 21, 2019, the Ballot Campaign failed to collect enough signatures and HB 6 went into effect..

54.     The Ohio Legislature may well repeal and replace HB 6.  But having hijacked Ohio's democracy and damaged Ohio's trust of an elected government, FirstEnergy, FirstEnergy Service, and the Individual Defendants are not entitled to "keep the change" of their ill-gotten gains.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action under Rules 23(a), (b)(1)(A), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and the other members of the Class, which is defined as:  All persons and entities resident in the State of Ohio who have and/or will have to pay a monthly surcharge for electric service pursuant to HB 6.

56.     Based on information and belief, the members of the Class exceed tens of several million, making joinder of all Class members impracticable.

57.     The claims set forth in this Complaint are common to each member of the Class.  The Plaintiff and each Class member are subject to the same rate increases set forth in HB 6.

58.     There are questions of law and/or fact common to the Class which predominate over any questions effecting individual members of the Class.  These include:  (a) whether the Defendants bribed the members of the Householder Enterprise to obtain bailout nuclear power plant legislation, HB 6; (b) whether the conduct set forth in this Complaint violated RICO and/or the Ohio Corrupt Activity Act; (c) whether the Class members are entitled to actual damages, punitive damages, statutory damages, or both; and (d) whether Defendants' conduct entitles the Class to recovery of attorneys' fees and expenses.

59.     The Plaintiff is an adequate representative of the Class members because he is a member of the Class, the claims he asserts in the Complaint are typical of the claims of the Class members,  Plaintiff's claims are not subject to any unique defenses, and Plaintiff's interests do not conflict with those of any other Class member.

60.     The named Plaintiff will fairly and adequately protect the interests of the Class.  None of the Plaintiff's interests conflict with any interest of the Class.

61.     The federal and state law claims set forth in this Complaint are proper for certification as a class action under the provisions of Rule 23.

62.    After addressing the questions common to the Class, only the determination of individual damages will remain, and that calculation is one of simple mathematics using the records maintained by the Defendants.

63.    This class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because there are tens of thousands of members in the proposed Class and repeated individual discovery and litigation of the common issues shared by all Class members would needlessly waste judicial resources. The names and addresses of Class members will be readily identifiable from records of Defendants and through discovery of this action.

64.    The Class members' interests in individually controlling the prosecution of separate actions do not outweigh the benefits of class-based litigation on those issues.

65.    It is desirable to concentrate the litigation of these claims in one forum. Any difficulty in managing this case as a class action is outweighed by the immense benefits the class action has in efficiently disposing of common issues of law and fact among the large number of litigants. Moreover, no Class member has enough at stake to warrant individual litigation against these obviously well-funded and ruthless defendants.

66.    The prosecution of this civil action by all Class members individually in separate actions would create a risk of inconsistent or varying adjudications of claims by the individual Class members that would establish incompatible standards of conduct for Defendants, could be dispositive of interests of other Class members not parties to the adjudications, or substantially impair or impede Class members ability to protect their interests.

67.     Upon information and belief, there are no other similar cases pending against the named Defendants which address the issues as are raised in this case.

68.     Further, Plaintiff has retained competent counsel experienced in class action litigation to further insure such representation and protection of the Class. Plaintiff and his counsel intend to vigorously prosecute this action.

69.     Managing this case as a Class Action should not present any particular difficulty.

## VIOLATIONS OF FEDERAL RICO AND OHIO CORRUPT ACTIVITY ACT
### (18 U.S.C. § 1962(c) & (d) AND OHIO REV. CODE § 2923.32(A)(1))

70.     Paragraphs 1-69 of this Complaint are realleged and incorporated by reference.  This claim is asserted against each of the Individual Defendants, FirstEnergy, and FirstEnergy Service for violations of RICO and the Ohio Corrupt Activity Act.

71.     Plaintiff is a natural person and, as such, is a "person" within the meaning of 18 U.S.C. § 1961(3) and Ohio Rev. Code § 2923.31(G).

72.     Defendants FirstEnergy and FirstEnergy Service are corporate entities and, as such, are "persons" within the meaning of 18 U.S.C. § 1961(3) and Ohio Rev. Code § 2923.31(G).  Each of the Individual Defendants is a natural person and, as such, each of them is a "person" within the meaning of 18 U.S.C. § 1961(3) and Ohio Rev. Code § 2923.31(G).

73.     At all times relevant to this case, FirstEnergy and FirstEnergy, as corporate entities, both individually and acting together, constituted an "enterprise," as that term is defined in 18 U.S.C. § 1961(4) and Ohio Rev. Code § 2923.31(C).  This enterprise is referred to herein as the "FirstEnergy Enterprise."   The Individual

Defendants, and each of them, as individual persons and as corporate officers, are separate and distinct from the FirstEnergy Enterprise.  At all times relevant to this case and for the reasons set forth in the Criminal Complaint, the Householder Enterprise also constituted an "enterprise."  As alleged in this Complaint, FirstEnergy, FirstEnergy Service, and the members of the Householder Enterprise constituted a group of persons associated in fact, and this enterprise is referred to herein as the "FirstEnergy-Householder Enterprise."

74.    In violation of Section 1962(c) & (d) of RICO, and in violation of Section 2923.32(A)(1) of the Ohio Corrupt Activity Act, the Individual Defendants conducted the affairs of the FirstEnergy Enterprise through a pattern of racketeering activity and a pattern of corrupt activity and/or conspired to do so.  In violation of the same statutory provisions, FirstEnergy and FirstEnergy Service conducted the affairs of the FirstEnergy-Householder Enterprise through a pattern of racketeering activity and a pattern of corrupt activity and/or conspired to do so.

75.    The purpose of the FirstEnergy Enterprise and the FirstEnergy-Householder Enterprise was to secure legislation favorable to FirstEnergy and FirstEnergy Service through the use of bribes that the Individual Defendants caused FirstEnergy and/or FirstEnergy Service to pay, as alleged in this Complaint.

76.    The FirstEnergy Enterprise and the FirstEnergy-Householder Enterprise have been engaged in (since approximately 2017) and continue to be engaged in, activities that affect interstate commerce.  These enterprises have been and remain longstanding, continuous, and open-ended.  The Individual Defendants, FirstEnergy, and FirstEnergy Service have engaged in a pattern of racketeering activity and a pattern

34

of corrupt activity, as described in this Complaint, in the Criminal Complaint, and in the Affidavit including, but not limited to, the extensive use of the U.S. mails and/or interstate wire facilities on different dates, to bribe Larry Householder and/or other elected representatives to pass nuclear plant bailout legislation (HB 6), defeat the Ballot Campaign (anti-HB 6 referendum effort), and expand Larry Householder's power to enable HB 6 to be passed and the Ballot Campaign defeated.

## PATTERN OF RACKETEERING ACTIVITY

77.     The Individual Defendants, acting individually and collectively and/or in conjunction with and/or coordinated with the members of the Householder Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity and a pattern of corrupt activity.

78.     The Individual Defendants, acting individually and collectively and/or in conjunction with others, devised a scheme to obtain legislation and prevent the repeal of legislation by means of false or fraudulent pretenses and representations, and through the payment of bribes.

79.     The Individual Defendants used the U.S. mails and/or interstate wire facilities and have caused the mails and wires to be used, or reasonably knew the mails and wires would be used, in furtherance of their fraudulent scheme(s) and the payment of bribes in return for the passage of nuclear plant bailout legislation (HB6) and to prevent its repeal.

80.     The Individual Defendants have used the mails and wires in connection with the payment of bribes for the passage of bailout legislation (the passage of HB 6), fraudulently obtained, and through the use of the mails and wires which has furthered

this illegal scheme and enabled FirstEnergy and/or FirstEnergy Service to take money and property from Plaintiff and Class members by means of false pretenses and representations and the payment of bribes, to obtain the passage of bailout legislation (HB 6) and preventing its repeal.

81. On information and belief, each and every one of the Individual Defendants has specific knowledge that the mails and wires are/were being utilized in furtherance of the overall purpose of executing the illegal scheme, and/or it was reasonably foreseeable that the mails and wires would be so used.

82. Each of the mails and wires in connection with the scheme(s) described in this Complaint, in the Criminal Complaint, and in the Affidavit, spanning a period from 2017 to the present, constitutes a separate instance of mail and/or wire fraud and, thus, is also a predicate act of racketeering activity and/or corrupt activity which, taken together, constitute a pattern of racketeering activity and/or a pattern of corrupt activity within the meaning of RICO and/or the Ohio Corrupt Activity Act. Other predicate acts, including payment of bribes for the passage of HB6 and the payment of bribes to prevent its repeal are set forth in this Complaint, in the Criminal Complaint, and in the Affidavit.

83. In addition, as alleged in this Complaint, in the Criminal Complaint, and in the Affidavit, the Individual Defendants, FirstEnergy and/or FirstEnergy Service have engaged in a variety of wrongful acts that constitute racketeering activity and/or corrupt activity, including (a) violations of 18 U.S.C. § 1951, relating to interference with commerce, robbery, or extortion; (b) violations of 18 U.S.C. § 1952 relating to racketeering, including multiple acts of bribery in violation of Ohio Rev. Code §

36

3517.22(a)(2); (c) violations of 18 U.S.C. §1956, relating to money laundering; (d) violations of 18 U.S.C. § 1957, relating to engaging in monetary transactions in property derived from specified unlawful activity; and (e) multiple acts involving bribery that are chargeable under Ohio Rev. Code § 2921.02.

## RELATIONSHIP OF PATTERN OF RACKETEERING ACTIVITY AND/OR CORRUPT ACTIVITY TO THE ENTERPRISE(S)

84.     As described in this Complaint, the goal of the FirstEnergy Enterprise and the FirstEnergy-Householder Enterprise was to obtain the passage of HB 6 through fraudulent, illegal means, through the payment of bribes to extract money and property from Plaintiff and Class members by requiring them to pay a surcharge on their electric utility bills.

85.     The pattern of racketeering activity and the pattern of corrupt activity described herein was integral to Defendants' scheme.  Without engaging in mail and wire fraud, and the payment of bribes, FirstEnergy, FirstEnergy Service, and the Individual Defendants would be unable to obtain passage of HB 6.

86.     As a direct and proximate result of the violations of RICO and/or the Ohio Corrupt Activity Act described in this Complaint, Plaintiff and Class members have suffered substantial injuries.  Plaintiff and Class members have and/or will pay monthly surcharges that range from 85 cents per month for residential customers to $2,400 per month for commercial customers operating large industrial plants, thus constituting an injury to Plaintiff and Class members within the meaning of 18 U.S.C. § 1964(c) and/or Ohio Rev. Code § 2923.34(E).

**CIVIL CONSPIRACY**

87.     Paragraphs 1-69 of this Complaint are realleged and incorporated by reference.  This claim is asserted against each of the Defendants.

88.     Defendants have engaged in a civil conspiracy to unlawfully injure Plaintiff and Class members.  Their actions evidence a malicious combination with the purpose of causing injury to the property of Plaintiff and Class members in a way not competent for one alone, resulting in actual damages.

89.     Apart from liability for a conspiracy to engage in racketeering or corrupt practices violations, and independent of those violations, the actions of Defendants previously described demonstrate a civil conspiracy with one or more members of the Householder Enterprise under state law to commit fraud, theft, and the other illegal activities previously described, including the scheme to obtain legislation and prevent the repeal of legislation by means of false or fraudulent pretenses and representations, and through the payment of bribes.

90.     The unlawful or tortious acts of the Defendants are attributable to one another.  All Defendants have agreed to and acted in pursuance of a common plan or design to commit unlawful or tortious acts, actively took part in it, and ratified and adopted the wrongdoer's act done for their benefit.

91.     Plaintiff and Class Members have been proximately injured as a result of Defendants' civil conspiracy.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all claims in this Complaint so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the members of the Class, respectfully requests that the Court enter judgment in their favor and against each of the Defendants, jointly and severally, as follows:

A. Declaring that this action is a Rule 23 class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel for the Class;

B. Declaring that HB6 is illegal and invalid legislation;

C. Ordering that any and all charges sought to be collected pursuant to HB6 be enjoined;

D. Ordering Defendants to render an accounting for all fees and charges collected from the Class;

E. Ordering Defendants to pay actual damages to Plaintiff and the other members of the Class;

F. Ordering Defendants to pay treble damages, as allowable by law, to Plaintiff and the other members of the Class;

G. Ordering Defendants to pay statutory damages, as provided by law;

H. Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiff and other members of the Class;

I. Ordering Defendants to pay both pre and post-judgment interest on any amounts awarded; and

J. Ordering such other and further relief as may be just and proper.

Dated:  July 31, 2020

Respectfully submitted,

THE KERGER LAW FIRM
By:___*Richard M. Kerger*_____
      RICHARD M. KERGER (0015864)
4159 N. Holland Sylvania Road, Suite 101
Toledo, OH  43623
Telephone:  (419) 255-5990
rkerger@kergerlaw.com

Marvin A. Miller*(1916769)
Andrew Szot* (6274264)
MILLER LAW, LLC
115 South LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  (312) 332-3400
mmiller@millerlawllc.com
aszot@millerlawllc.com

Kevin P. Roddy* (175362)
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
kroddy@wilentz.com


Attorneys for Plaintiff and the Members of the Class (* - attorneys to be admitted *pro hac vice*)